[Crim. No. 1735. Second Appellate District, Division Two.—February 26, 1929.]

THE PEOPLE, Respondent, v. LOUIS BIESCAR, Appellant.

206

Nathan O. Freedman, Wm. J. Leete and A. Wm. Christlieb for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

WORKS, P. J.—Defendant was convicted of the crime of rape, perpetrated by means of force and violence. He appeals from the judgment and from an order of the trial court denying his motion for a new trial.

Appellant insists vigorously that the evidence was insufficient to support the verdict of guilty. He makes no denial that he had sexual intercourse with the complaining witness at the time fixed in the charge against him, but contends that the act was performed with her full

consent and that she submitted most willingly to his embraces. As there are some features of the evidence which tend strongly to support this claim of appellant we deem it necessary to set down in some detail the occurrences which led to his conviction. Both appellant and his alleged victim were members of a coterie of young people who seem to have conducted themselves with great freedom in their interrelations. Some of the crowd, perhaps most of them, knew each other only by their given names or by "nicknames." At the period which is of interest here the prosecuting witness, known to her associates as Pats, was nineteen years of age. One of her girl friends, to whom we shall refer hereafter as Rose, and who figures somewhat prominently in the case, was twenty-one or twenty-two. Appellant was twenty-nine. Appellant and Pats became acquainted on March 17, 1928. On the evening of that day she and Rose and some others—the party was apparently composed of eight or ten persons when all had arrived, perhaps more—came to the four-room cottage in which appellant kept bachelor's hall, on a "party." Drinking and dancing were indulged in during the evening, the former to such an extent that all the guests remained in appellant's house throughout the night. Some of them slept on the floor and the two beds in the place were fully occupied by others. It is strange to note that a brother of Pats, or perhaps of Rose, was one of the members of this "wild" party. Appellant and Pats, both having arisen in the early morning, met each other in the kitchen and at once planned a walk to a hill near the house for the purpose of plucking wild flowers. They went over the top of the hill and into a grove of trees, where appellant says they yielded to their sexual desires. Pats denies this consummation, but testifies that appellant made improper advances to her—"started things that weren't right"—and that she compelled him to desist only by threatening to scream. They soon returned to the house, where they found two of the other girls preparing breakfast for the crowd. The party did not conclude after this meal. Appellant led his guests to his father's ranch, some miles in the country, starting at about 11 o'clock in the morning, and where, some time after their arrival, all had another repast. While they were all at the ranch Pats and appellant went together to a bath-

house which was near a swimming pool on the place and entered it together. Appellant says that there they fondled each other and were again about to indulge in carnal embrace when they were interrupted by a woman passing the bathhouse. Pats testified that on this occasion appellant made improper advances but that she again resisted him, and that she again threatened to give warning by screaming. Just when this party of March 17th–18th ended the record does not show. Pats and appellant did not see each other after the party until May 23d, upon which day the crime of which appellant was convicted is charged to have been committed. At 3 o'clock on the afternoon of that day appellant appeared in his car at the home of Rose. He had with him a gallon of wine which he took into the house, where he and Rose and her mother had a drink together. Appellant then poured out a quart of wine and gave it to Rose's mother. The girl was employed at a bakery, where she worked from 4 o'clock in the afternoon until midnight, and appellant offered to take her to the bakery in his car. They soon set out, but stopped at the home of Pats to ask her to drive with them to Rose's place of employment and return with appellant for the ride. They found Pats preparing dinner for her parents, who were working people and expected to be home at about 6 o'clock, but she agreed to take the ride, upon which they soon started. At a little distance on the trip they all had a drink of wine without stopping the car. A little later they halted at a gasoline station operated by a man with whom appellant was acquainted and appellant asked him to join them in a drink. The two girls and the two men then partook of the wine together. Rose was then taken to the bakery and Pats and appellant started on their return. They stopped, however, at appellant's cottage, in order for him to change his clothes so that he might be in better condition to meet her "folks" when he took her home. Pats entered the house with him without objection and they at once had a glass of wine together. She then played his phonograph while he started dressing. At some stage in his preparations Pats offered to shave him and did so. They each had one more drink of the wine. After this last drink Pats, according to her testimony, started toward a davenport and her mind "became a blank." She doesn't know

whether she reached the davenport or not. This Pats says, was about 5:15 or 5:20 o'clock. She testified that she regained consciousness at about 9 o'clock, and then found herself in bed with no clothing but a small undergarment. She says that appellant was in bed with her, entirely nude, and was endeavoring to violate her person. She testified that she tried to fight him off, but that he choked her, beat her, called her vile names and finally accomplished his purpose, when she again lapsed into an unconsciousness from which she did not recover until nearly midnight. Appellant says, to the contrary of all this, that after the last drink he went to his bathroom, that when he returned he found Pats undressed and in bed, that he then disrobed and got into bed with her, when they immediately had sexual intercourse without resistance on her part. At the preliminary examination Pats testified that her mind "became a blank" at 4:40 o'clock, instead of at 5:15 or 5:20, as above related. At the preliminary she also testified that she first regained consciousness at "25 minutes to 12 or 20 minutes to 12," thus omitting in that relation all reference to the spirited battle which, at the trial, she said occurred at about 9 o'clock. According to the testimony at the preliminary there was one continuous period of unconsciousness of about seven hours' duration, while, according to what Pats said at the trial, there was one period of about four hours followed by another of about three, with an interval of complete consciousness and of great activity between. At any rate, and no matter which of these recitals was the truth, or whether either of them was true, appellant took Pats home in his car, starting not far from midnight.

Standing alone the story of Pats as to the wrongs she says she suffered is inherently improbable to a degree. After two experiences with appellant, those of March 18th, during which, as she says, she was able to subdue his sexual ardor only by threatening to make vigorous outcry, it is strange that she was willing to place herself under his control by entering his house without protection further than her ability to scream. It is strange, in such a situation, that she was willing to indulge with him in further draughts of wine, that notorious heater of the blood. It is strange that she was so completely overcome by the amount of wine she had taken, especially as she and appellant agree that the

last drink was plentifully diluted with water, unless the liquor was of an unusual potency. It is strange, if it be granted that her mind did become a blank, that she remained unconscious for either seven hours or four, especially as during the time she was undressed, with all the handling the process implied, and put to bed. Considering the lascivious inclination which appellant had already shown toward her on two occasions, considering that he had her in his power, it is strange that he did not awaken her with his attentions before either four or eight hours had passed, if he revived her in that manner at all. It is strange that her story at the preliminary examination and her recital at the trial could be so discrepant.

Notwithstanding, however, the improbability of the story of Pats as to particulars, we think the record contains sufficient corroboration of that part of it to the effect that appellant violated her person by the employment of force. The father of Pats testified that he was awakened from sleep by a ring at his door-bell at about twenty minutes after midnight of May 23d. He went to the door and found his daughter lying on the floor of the front porch unconscious. He carried her to her bedroom and was seen doing so by his wife, who had been awakened also. The two parents, after the mother had undressed the daughter, observed scratches and bruises on various parts of her person. These were not accurately described by the parents, as they were foreigners and spoke English badly, but they were described by witnesses who testified later. The upper lid of one of the girl's eyes was discolored. A bruise the size of the palm of a hand was found on one of her arms. Her lip was bleeding. There were scratches about the face, about the neck and about the thorax, both front and back, and a bruise was present near one of her breasts. There were scratches or stripes across the lower portion of her back, her buttocks and the upper portion of her legs. Bruises or marks were seen on one of her legs between the knee and the ankle. Approximately an hour and a half after Pats reached home a physician was called to attend upon her, but he did not arrive until after 4 o'clock. He noted the marks upon her person and described them to the jury at the trial. Pats was examined by a woman who was the physician for the juvenile court, not far from noon of May 24th, and she

described to the jury minutely, the marks found by her on the person of the girl. She also gave other testimony which was most damaging to appellant. She had made a careful pelvic examination of Pats, which included an examination of the "genitalia." She testified, after describing the marks on the girl's person: "On pelvic examination there was a bilateral complete laceration of the hymen probably of a— only a few hours' duration. The surfaces were still bleeding at the time I examined her." This physician also testified that she did not recall ever having known "of cases where a woman has had sexual intercourse and that her hymen has not been ruptured by having sexual intercourse." This line of testimony tended effectually to disprove appellant's statement that he and Pats had indulged in the sexual act on the morning of March 18th, and, the jury believing it, cast discredit upon his entire testimony.

However improbable the details of the story told by the prosecuting witness on the stand, we are satisfied that the record presents a conflict of evidence, and that the contention of appellant that the evidence was insufficient to support the verdict cannot be upheld.

█ It is further claimed by appellant that the trial court erred in rulings upon the admissibility of evidence while Rose was upon the witness-stand. The rulings which are asserted to be erroneous were made during the cross-examination of the witness. On direct examination she had given no testimony whatever concerning the party which occurred at appellant's home on March 17th and 18th. At the beginning of the cross-examination she was asked whether she was present at the party and she answered that she was. She also testified that Pats was there. She was then asked who were present on the occasion and whether Pats had accompanied her to the house. Objections were made, but solely upon the ground that these questions were immaterial, and the objections were sustained. We think the rulings, coming at that stage of the trial, were correct. Only one witness had preceded Rose on the stand, the physician who reached the bedside of Pats on the early morning of May 24th, and who was called out of order to testify as to her condition when he saw her at that time. When the questions were asked Rose to which the objections were made, the materiality of the occurrences at the party had not been made to appear.

The witness was then asked several questions as to happenings at the party. To each of these the objection was made that they were not proper cross-examination and the objections were sustained. These rulings were all correct. As we have already observed, no mention of the party was made during the direct examination of the witness.

■ Pats took the stand immediately after the conclusion of Rose's testimony. During her direct examination no mention was made of the party of March 17th–18th. Notwithstanding that fact the witness was asked, on cross-examination, several questions concerning occurrences on that occasion, for the purpose of showing the unchaste conduct of Pats with other men. Objection was made to each of these questions on the ground that they were not proper cross-examination and the objections were sustained. Here is a very different situation from that which was presented when Rose was on the witness-stand. In *People* v. *Degnen,* 70 Cal. App. 567 [234 Pac. 129], a prosecuting witness in a rape case had related on direct examination, in a general way, certain events which had transpired between her and the defendant in the case, and we held that he was entitled, on cross-examination, to pursue an inquiry tending to bring out more fully the nature of the relations between the prosecutrix and himself preceding the time when the crime was charged to have been committed. We said that the defendant had the right to prove earlier misconduct of the prosecutrix with him, "if any there was, out of her own mouth, if he could, either directly or by circumstances from which the jury might justly infer that she had been guilty of misconduct, and for that purpose his counsel had the right to embark upon a searching cross-examination, limited only by the very broad lines of the direct examination." In leading up to the discussion which ended in the conclusion just stated we said in our opinion, now employing italics which are not in the reported case: "[T]he next question arising is whether, on the cross-examination of the prosecuting witness in a rape case, the defendant may put questions calculated to prove that she had, previous to the time set out in the charge, willingly submitted herself to his carnal embrace, or, if not proving the fact, tending to affect the credibility of her story that the alleged criminal act was resisted by her, and, in fact, the credibility of her entire testimony. And

we have not here a case in which the prosecutrix merely recited the occurrences of the occasion mentioned in the indictment, including her statement that she resisted appellant's assault upon her honor, *a situation which might make less clear* the right to cross-examine for the purposes indicated, but she told a story of her association with appellant from the time she became acquainted with him, in April, 1923, to the day in July of the same year upon which it is charged that his crimes were committed.'' We think that if, in *People* v. *Degnen,* the prosecutrix had not related on direct examination the ''story of her association with appellant'' from the date of her acquaintance with him, he could nevertheless have pursued practically the same line of cross-examination he sought to conduct in the case, although his right to do so might appear ''less clear'' than the right arising because of ''the very broad lines of the direct examination.'' We think, under the imagined circumstances, he could have conducted the cross-examination in order ''to affect the credibility of her story that the alleged criminal act was resisted by her.'' We are in this case confronted by the somewhat related question: Was it proper for appellant to cross-examine Pats as to the occurrences of the all-night party which commenced on March 17th, for the purpose of showing her conduct with men other than the one against whom she made the charge of rape, even if she did not mention the party on her direct examination? That appellant properly could have proved such matters affirmatively and as a part of his defense testimony is certain, and that he actually attempted to do so will appear later. We thus summed up the law upon this subject in *People* v. *Degnen:* '' [I]n a prosecution for rape by force and violence unchaste acts of the prosecutrix committed with other men than the defendant may be shown for the purpose of disproving the allegation that the act charged against the defendant was perpetrated through the exercise of force, and despite the unwillingness of the prosecutrix (*People* v. *Benson,* 6 Cal. 221 [65 Am. Dec. 506]; *People* v. *Shea,* 125 Cal. 151 [57 Pac. 885]).''

Undoubtedly, under the rule laid down in *People* v. *Benson* and in *People* v. *Shea,* proof may be made that a prosecutrix has had carnal connection with men other than the defendant on trial. May it be shown that she has com-

mitted acts with other men from which the jury might justly infer—let us say, to state an extreme case, from which the jury would practically be compelled to conclude—that there had been a submission of the prosecutrix to the sexual embrace of other men? That is the question presented here. *People* v. *Benson* refers to acts of "lewdness" without showing further the nature of the acts sought to be proven, and we have not been able to procure access to the record in the case for the purpose of ascertaining the nature of the questions propounded. It is said in *People* v. *Shea* that the prosecutrix "had *consented* to the having of sexual intercourse with other men" (italics ours), a form of expression which is not as definite as it might be upon the particular point which is now of interest, and we have not seen the record in that case. The court, however, cites several cases from other jurisdictions in support of the rule first laid down in this state in *People* v. *Benson*. It is said in the first of these, a criminal seduction case: "The chaste character of the witness was directly in issue, for, by the terms of the statute, she must have possessed that character in order to render the act of the defendant punishable under its provisions. In order to determine her character for chastity, her acts and conduct could have been inquired into. It is proper in such cases to extend the inquiry, not only to the fact whether the woman has had, previous to the time when the offense is alleged to have been committed, sexual connection with other men, but whether she is pure and chaste in character as to her actions and habits of life. Unchaste character may be established by such evidence. (*Andre* v. *State*, 5 Iowa, 389 [68 Am. Dec. 708].) A woman who would indulge in indecent and lewd conversation, who would knowingly associate with the abandoned and licentious, or would act with indecency, and in a manner inconsistent with virtue and purity, is not of the chaste character contemplated by the statute. Of course, want of chastity may be shown by proof of improper intimacy or direct sexual intercourse with men. It is obvious that evidence tending to establish conversation, conduct, and acts of the character above stated, is competent to establish a character for unchastity. Witnesses may be introduced to prove such facts, and there is no question why the woman alleged to have been seduced, upon cross-examination, may not be examined in relation

thereto. Her character for chastity is directly in issue; she is presumed by the law to be chaste, and to rely upon this presumption, although she does not expressly testify to her own purity. Upon this issue, in order to contradict the presumption of law or her own evidence of chastity, she may be required to testify to acts tending to prove her unchastity.'' (*State* v. *Sutherland*, 30 Iowa, 570.) In another of the cited cases, a rape case, it is said, the opening reference being to the prosecutrix: ''There was no direct evidence that she allowed sexual intercourse with her, but an array of facts and circumstances was made, from which it might be determined that she had done so, the most important of which was that she was seen under suspicious circumstances with an unknown man in the vicinity of the piles of lumber. The question whether she was the person thus seen, necessarily depended upon satisfactory proof of her identity, and the persons testifying on the subject had only seen her from a distance, and described her by her dress and general appearance only. On the trial, however, the plaintiff in error offered to show, by a witness on the stand, that the complainant was a woman of drunken and dissipated habits, sleeping, generally, in the hallway of a tenement house, and accustomed to go in there at two or three o'clock in the morning. This was excluded and exception taken, the court stating that it was not meant to exclude proof of her general reputation for truth and veracity, or any other evidence as to her moral character. The plaintiff in error was confined, therefore, to proof as to general character for morals, truth and veracity, and prevented from showing particular acts which, it would seem, were, in themselves, evidence of general immoral character. The plaintiff in error also offered to show, by a witness then on the stand, as follows: 'Counsel—I offer to show, now, by Mr. McCarten, that on the day in question, the fifth day of September, he met this complainant in the street; that he gave her a chew of tobacco; that she went to a liquor saloon with him in the vicinity, drank liquor with him in Myers' place, in Forty-ninth street and First avenue; after which she accompanied him to the lumber yard . . . and endeavored to get this man to have carnal intercourse with her,' which offer was excluded and exception noted. The first offer, as to the dissipated habits of the complainant, seems to be within the principle or

doctrine of *Woods* v. *People,* 55 N. Y. 515 [14 Am. Rep. 309]. The fair inference to be drawn from such conduct was, that she was a dissipated and immoral woman, ready for any form of immorality, whether of sexual intercourse or otherwise, which might be demanded of her. Such conduct is not consistent with a virtuous life, and marks the existence and progress of moral depravity. If the legitimate conclusions to be drawn from general conduct are such as to warrant the particular charge made, evidence of general conduct should be received in such a case as this for the purpose, although each act of such conduct, considered by itself, would be proof of a particular fact. The offer made in the case cited was not to show the general reputation of the complainant, but that she was in the habit of receiving men for promiscuous intercourse, and especially for liquor. This evidence, the court said, was competent, not for the purpose of impeaching the general credibility of the witness, but upon the question whether she assented to the intercourse with the prisoner. The offer to show by McCarten what has been stated was, in part, for the purpose of contradicting the complainant. She was asked whether she did not go with him to a liquor shop and drink; and whether she did not go to the lumber yard with him, and she answered no to each inquiry. It was objected that the cross-examination, in this respect, was upon matters immaterial to the issue, and that there could be no contradiction of the replies. This view of the question was erroneous. (*People* v. *Abbot,* 19 Wend. (N. Y.) 192.) The issue involved the character of the prosecutrix for truth and veracity, morality and chastity, not because though she were ever so bad she might not be outraged, but because the presumptions in such prosecution as this, against the necessity of employing force, must exist when the character of the person assailed is shown to be immoral and wicked." (*Brennan* v. *People,* 7 Hun (N. Y.), 171.) None of the other cases cited in *People* v. *Shea* is particularly helpful here, as they all contain language general in character, like that employed in *People* v. *Benson.* It will be observed, however, that two of them, *People* v. *Abbot,* 19 Wend. (N. Y.) 192, and *Woods* v. *People,* 55 N. Y. 515 [14 Am. Rep. 309] are cited in *Brennan* v. *People.* It would appear that the supreme court of this state; in citing *State* v. *Sutherland* and *Brennan* v. *People,* has vouched

for them as in point in *People* v. *Shea,* and has adopted the doctrine enunciated by them. And justly so. If in forcible rape cases sexual intercourse with other men than the defendant may be shown, it follows that acts may be proven from which the commission of such intercourse may be inferred by the jury. The latter proof is permissible under the general rule of evidence to the effect that a fact in issue may be shown by circumstantial evidence.

It appears sufficiently clear to us that appellant had the right to go into such matters on the cross-examination of the prosecutrix. The books are full of cases to the effect that the prosecutrix in a rape case may be subjected to an unusually thorough, searching, and protracted cross-examination. The reasons upon which this rule is based have been stated in different forms. ''There is no class of prosecutions attended with so much danger, or which afford so ample an opportunity for the free play of malice and private vengeance. In such cases the accused is almost defenseless. . . . '' (*People* v. *Benson,* 6 Cal. 221 [65 Am. Dec. 506].) ''In this class of prosecutions the defendant, owing to natural instincts and laudable sentiments on the part of the jury, and the usual circumstances of isolation of the parties involved at the commission of the offense, is, as a rule, so disproportionately at the mercy of the prosecutrix's evidence that he should be given the full measure of every legal right in an endeavor to maintain his innocence'' (*People* v. *Baldwin,* 117 Cal. 244 [49 Pac. 186], and see *People* v. *Costa,* 24 Cal. App. 739 [142 Pac. 508]).

Despite these reasons, however, and within the ordinary principles of the law of evidence, it would seem that the questions addressed to Pats were proper cross-examination. She had testified on direct examination that she resisted to her utmost the attack made by appellant upon her. Under the authorities any witness could have been called by appellant to show, as a part of his defense, her unchaste behavior with other men, as tending to disprove her assertion that she resisted him. It seems, therefore, that she could have been questioned on her cross-examination in order to draw from her own lips, through that medium, evidence showing or tending to show the untruth of this assertion made by herself. The evidence tending to show the untruth of her assertion being in her own mind—granting that she had misconducted her-

self with other men—the right must have existed to search that mind, on cross-examination, to elicit the contradicting evidence. Under the law permitting a showing of previous unchastity by prosecuting witnesses in cases of rape by force, an assertion by such a witness that force was exerted and that she resisted it is in the nature of an assertion that she is a woman of chastity (*State* v. *Sutherland, supra*). There must be a right, on cross-examination, to search the mind of such a witness in order to confute her statement to that effect. Suppose she had actually said on her direct examination: "I was a chaste woman, I had never submitted myself to the embraces of any man, and I resisted the defendant with all the force at my command." Could she not then have been cross-examined in an attempt to show her previous unchastity? And yet that is what, in effect under the law of this state, she did say when she testified that she resisted. We think the court erred in sustaining the objections to the questions. In considering this point we have had before us *People* v. *Burrows,* 27 Cal. App. 428 [150 Pac. 382], a rape case. There certain questions were addressed to the prosecuting witness on cross-examination for the purpose of showing her unchastity. The court said: "These questions . . . were not within the proper scope of cross-examination, and, besides, it is clear that the character of a witness cannot be impeached in that manner." The case is not in point here, for the charge was rape upon a girl under age. Under all the authorities the questions of force and resistance were not in the case. Therefore the questions asked could not have operated to show the untruth of anything said by the prosecutrix on her direct examination.

In addition to the questions to which reference is made in the last preceding paragraphs, Pats was asked: "And is it not a fact on the night of March 17, 1928, at Mr. Biescar's home you and another young lady and two men were present, slept together that night in a bedroom at Mr. Biescar's home?" This question was objected to "as incompetent, irrelevant and immaterial, not tending to show any prior act of sexual intercourse between this defendant and the prosecutrix." The objection was sustained. The ruling was error.

On her recross-examination the prosecutrix was asked: "Is it not a fact that on the night of March 17, 1928, that you

and another girl and two fellows occupied a bedroom at Mr. Biescar's home together and slept all night together in that room?" Objection was here made that the question was not a proper cross-examination and it was sustained. This ruling also was error.

When appellant was on the witness-stand he answered various questions concerning the gathering at his house which commenced on the evening of March 17th. He was then asked if he knew where Pats slept that night, if he knew whether any man slept with her, and whether any man occupied the same bed with her. It was objected to each of these questions that it was incompetent, irrelevant, and immaterial, and each objection was sustained. The rulings were error.

Appellant makes four assignments of misconduct alleged to have been committed by the district attorney at the trial. ■ The first of these is shown by the following extract from the record of the cross-examination of appellant: "Q. Have you ever been married? A. Yes. Q. How many times? A. Once. Q. When did you get married? A. 1922. Q. Aren't you married now? A. Yes. Q. You got married recently? A. About a month ago. Q. That is twice you have been married, isn't it? A. Yes. Q. You didn't mean to mislead anybody here just a second ago when you said just once, did you? A. What do you mean? Q. Is the question ambiguous? Didn't you state a moment ago you had been married only once? A. You asked me how many times I have been married? Q. You said once. A. Twice. Q. You were married about two or three weeks ago? A. Three weeks ago. Q. And you were married in 1922 to another woman? A. Yes." The only claim of misconduct, based upon this portion of the record, is that the district attorney offended in inquiring "whether the defendant was married and how many times he had been married." We think there was no misconduct in this regard, or if there was we think that it was not such that the harm wrought by it, if there was any, could not have been removed by admonition to the jury, and none was asked for. Nor, indeed, were objections made to the questions. We shall say something hereafter, when considering the effect of section 4½ of article VI of the constitution upon the appeal, concerning the unfair attitude of the district attorney during the cross-

examination of appellant, exhibited in part by the question, "You didn't mean to mislead anybody here just a second ago when you said just once, did you?" and by the questions which immediately followed it. It should be noted, in explanation of the answer to which the prosecutor thus took exception, that the second marriage of appellant occurred about two months after May 24th, the day upon which it is charged that his crime was committed.

■ The second claim of misconduct is founded upon this part of the record of the cross-examination of appellant: "Q. Is it not a fact that you offered this young lady $5,000 if she wouldn't appear as a complaining witness in this case? Mr. Brown: I object to that on the ground it is not proper cross-examination. The Court: Objection sustained. [The District Attorney] : I have a right to lay a foundation for impeachment; got a right to any question upon those lines. It is a proper way to lay the foundation for impeachment. The Court: . . . You will have to produce some authorities on that particular point. Objection sustained without prejudice." The question here propounded may have been a proper one, not deciding whether it was correct to ask it on cross-examination or whether it was not. It has been determined, in a rape case, that it is probably proper to receive testimony to show that the defendant has endeavored to suppress evidence damaging to him, as "a rational inference might be drawn from it that defendant thereby manifested a consciousness of guilt" (People v. Davenport, 13 Cal. App. 632 [110 Pac. 318]). Certainly, with that decision in existence, it was not misconduct to ask the question here propounded, even on the cross-examination of appellant.

■ The following portion of the record, on appellant's cross-examination, furnishes the foundation for the third claim of misconduct: "Q. . . . Did you ever offer to marry this young lady that has accused you of this offense? A. I don't remember. Q. What is that? A. I don't remember saying that. Q. You wouldn't say that you had not offered to marry her, would you? A. I don't remember saying that at all. Q. But will you state now that you had never offered to marry her since she accused you of this offense? Mr. Brown: I object to that as not proper cross-examination. The Court: Objection sustained. [The District Attorney] : Haven't I a right to show his interest in this case, whether

or not he offered to marry her after a charge—accused of this offense? The Court: I guess he has an interest in the case all right being a defendant. [The District Attorney]: Haven't I a right to prove his interest in the case? The Court: Objection sustained without prejudice to that line. [The District Attorney]: You want some authority on that too? The Court: Yes." In view of the decision cited in the last preceding paragraph, there was no misconduct in the asking of the questions here set forth, as, if an offer to marry the prosecutrix had been shown, a "rational inference" might have been drawn from it that in making the offer appellant showed a consciousness of guilt. The jury might have inferred from such evidence that appellant projected a marriage in order to remove the possibility of the prosecutrix testifying as a witness against him.

■ The fourth claim of misconduct is founded upon this part of the record of appellant's cross-examination, coming after a reference to his place of residence: "Q. Were you living there alone? A. Yes, sir. Q. Batching it? A. Batching. Q. Accustomed to have young girls come up to your house; is that right? A. Why, not exactly. Q. You did have them up there, did you? A. Yes, sir. Q. Often? A. Why, sure I had." We think this portion of the record shows misconduct on the part of the prosecution, as the law is well settled that the questions asked were improper. It is not permitted in a rape case to make such proof. Under such a charge "evidence tending to show the lewd, immoral and indecent conduct with women other than the prosecuting witness is inadmissible" (22 Cal. Jur. 389). It is true that no claim of misconduct was made at the trial, nor was the evidence objected to, but we think the questions were so damaging, especially when we consider the manner in which appellant answered them, that an admonition addressed to the jury by the judge would have been unlikely to remove the harm done.

■ We are now to inquire, pursuant to the mandate of section 4½ of article VI of the constitution, whether the errors committed at the trial have probably resulted in a miscarriage of justice, and we have examined the entire cause, including the evidence, in order to discharge that duty. At the base of the discussion of this question lie considerations arising from the inherent improbability of the story told on

the stand by the prosecutrix. We have already shown sufficiently the unsatisfactory character of that story. It becomes necessary now to pay some attention to the evidence, cited in the early part of this opinion, which was corroborative of the assertion of Pats that she resisted a forcible assault of appellant upon her chastity. The physician who made the examination of the prosecutrix at about noon of May 24th testified as to the condition of the hymen at that time, and she said that the laceration was "still bleeding at the time I examined her." There was some contradiction of this testimony. The physician who saw Pats at 4 o'clock of the morning of the 24th, after describing the marks upon her person, testified: "Otherwise no findings, no physical findings of the generative organs. I could not examine completely because the light was poor and I hadn't any instruments, no speculum with me, but as far as I could feel and see there was a tenderness, certain tenderness of the vagina, and the examination was painful. I couldn't find any blood but some mucous discharge." Although the examination made by this physician was not complete, it was thorough enough, it will be observed, for him to say that there was a mucous discharge from the vagina. This examination, as it must be assumed from the fact that the physician had no instruments, was digital. As he went as far as he could *feel* and far enough to find a "certain tenderness of the vagina," the vagina being above the hymen, and to demonstrate that "the examination was painful," he must have meant to say that his fingers were unpolluted by blood upon their withdrawal. This being so—as he "couldn't find any blood"— the jury might justly have determined that the hymen had not recently been ruptured, that it was not bleeding at that time, and that, consequently, the organic evidence of chastity had been obliterated on some earlier occasion. The jury might also have found that the laceration and blood observed by the physician who examined Pats later were the effects of some manipulation practiced by the girl, with sinister intent, after the first physician examined her and before the second saw her. This was not impossible, as questions addressed to the witnesses at the trial plainly disclosed a theory of the defense that the marks and bruises upon the upper part of the body of Pats were self-inflicted and that those on her back, buttocks, and upper legs were the result of

corporal punishment by her parents, rising in just wrath because of her delinquency in not having a dinner ready for them at 6 o'clock—which the evidence shows they had to prepare for themselves after their day's work—and, following such a dereliction, in not returning home until midnight or after.

In opposition to the entire testimony of Pats, appellant who was the sole witness for the defense, told a story that was thoroughly consistent and reasonable, although marred at points, indeed, by a boastfulness and demeanor which were in a considerable degree offensive and damaging.

In considering the application of the constitutional provision to the case we think it necessary to refer briefly to the attitude of the district attorney during the cross-examination of appellant. The nature of some of his questions is disclosed by extracts from the record which are made above, and we find it unnecessary to refer to other specific instances. The attorney-general, in the midst of his argument in refutation of the claim that the prosecutor was guilty of misconduct, volunteers the statement that the methods "employed by the district attorney in cross-examining the defendant are somewhat unfair and often along immaterial matters." With this statement we agree. We add that the attitude of the officer was dictatorial, was at points insulting and was at other times inconsiderate and harsh. We entertain no doubt that this conduct was sufficiently wide from the ordinary and proper amenities of a courtroom to have in some degree, at least, degraded appellant in the estimation of the jury.

When added to the improbable story of the prosecutrix, the errors committed at the trial were such that it is quite probable that a miscarriage of justice has resulted in the case. Especially, if appellant had been allowed to go into the details of the party of March 17th–18th, either upon the cross-examination of the prosecuting witness or upon his own direct examination, he might have been led to offer the testimony of other participants in the event, thus possibly furnishing some considerable corroboration of the testimony which he, as the sole witness for the defense, gave from the stand. We think, finally, that appellant had not the fair trial that is contemplated by the law.

Judgment and order reversed.

Thompson (Ira F.), J., concurred.

CRAIG, J., *Dissenting.*—I dissent. The contested points in this case have been the subject of many decisions, among which there has been considerable conflict. That there is a conflict in the California decisions is pointed out in *State* v. *Apley*, 25 N. D. 298 [48 L. R. A. (N. S.) 269, 141 N. W. 740]. It may be asserted without question that the weight of authority is contrary to the rule expressed in the foregoing opinion which is sustained by certain decisions in this state.

It has been held that in a prosecution for forcible rape the defendant may show that the prosecutrix has had illicit relations with other men. (*People* v. *Shea*, 125 Cal. 151 [57 Pac. 885].) However, it is there conceded that this ruling is against the weight of authority elsewhere, and the decision is based upon that rendered in *People* v. *Benson*, 6 Cal. 221 [65 Am. Dec. 506], which to my mind is a most ill-considered opinion. This also was the view of Mr. Justice McFarland, who dissented in the Shea case. Of the authorities cited in the last-named case, I regard none as in point. When it is said that a prosecutrix in a case of this nature puts her chastity in issue by merely testifying that she resisted the defendant's force, and the announcement of this amazing rule is based upon decisions in seduction cases governed by particular statutes having to do with that wrong, it seems obvious that the opinion is open to grave doubt as to its soundness. To my mind, such a rule is abhorrent. It would be as reasonable and as right to allow proof that a defendant charged with murder or larceny has upon some other and remote occasion committed a similar offense.

But though a prosecutrix might, because our supreme court has so held in the Benson and Shea cases, be shown to have consented to intercourse with someone other than the defendant, it has not been held even in this state that any proof falling short of such an act may be shown. Nor have we any decision making it proper to establish such a fact on cross-examination where the direct examination has been as limited as that in the instant case. If the evidence in question was admissible at all, it would have been proper only as a matter of defense.

To my mind, the story told by the prosecutrix is not inherently improbable. It will serve no good purpose to argue this phase of the matter in this dissent, but if her

testimony is not highly improbable, and since it is concededly amply supported by corroborative evidence, I think the verdict of the jury should not be disturbed on appeal. I am quite convinced of the defendant's guilt, and believe that even if error was committed in the exclusion of evidence suggested by way of defense tending to show that the prosecutrix had been indiscreet, but not immoral, such a ruling did not affect the substantial rights of the defendant, nor result in a miscarriage of justice.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 13, 1929, and the following opinion then rendered thereon:

WORKS, P. J.—On petition for a rehearing of this cause it is insisted that we have exceeded our powers under section 4½ of article VI of the constitution. It is said in the petition: "In the opinion of this court it is quite evident that it has not confined itself to the question of whether the evidence is close, that is, whether from the evidence for the prosecution and the defense it is doubtful whether appellant committed the offense, but has launched upon an attack of the reputation and character of the prosecutrix." It is difficult to perceive, as it seems to us, how this view of our opinion can be taken, but as language often appears clearer to the writer of it than to the reader, and as our expressions may seem as lacking in clarity to others as they do to petitioner, we shall endeavor to make ourselves more plain. After the examination of the record, which is required by the constitution, we came to the conclusion that "the evidence is close" and that "it is doubtful whether appellant committed the offense" charged against him. The improbable character of the story of the prosecutrix was one of the factors leading to this conclusion. We do not scruple to say that we do not believe the story, standing alone. Another factor conducing to the doubt as to appellant's guilt we found in the testimony of the physician who examined the prosecutrix at 4 o'clock in the morning. It is manifest that this doctor made a digital exploration of the genitals of his subject and that the excursion went into the vaginal cavity. Therefore, his fingers passed beyond the site of the hymen. The Standard Dictionary says that the hymen is a

membrane "which usually partially closes the vagina in virgins." Webster defines it: "A fold of mucous membrane partly closing the orifice of the vagina." The entire story of the prosecuting witness would have been condemned if the testimony of the doctor had been believed by the jury, for his evidence is susceptible of no other construction than that the hymen of his patient had not been ruptured that night and that the blood which the woman physician found at about noon the next day could not have come from a rupture which occurred that night. If there was no blood at 4 in the morning it would be unreasonable to believe that there could have been blood at noon, unless it had been designedly caused to flow by some means employed in the interim. It is to be observed here, parenthetically, that a chemist who had examined the little garment the prosecutrix wore while in the bed with appellant was called as a witness. He testified: "Q. Will you state to the jury what your examination consisted of, what your findings were? A. On the lower front part was a stain which I examined for semen and I got a positive test for semen. The back was stained slightly with a pinkish discoloration which proved to be from wine." It will be remembered that the first physician was not called until at least about an hour and a half after the prosecutrix reached home, following the events portrayed in her peculiar story. This was the doctor's testimony. The testimony of the father of the prosecutrix was, clearly and positively, that the period was more than two hours and a half. Her mother said it was "around" two hours and a half. If the jury had believed the testimony of the first physician, and—being properly advised during the argument of counsel—had compared it with the testimony of the second, the members of that body—acting again under proper enlightenment—could not but have wondered what happened· at the home of the prosecutrix during that hour and a half, or two hours and a half. Were the marks on the person of the girl inflicted during that period?

There is a reason shown by the record why the jury might have inclined to believe the testimony of the first physician. He had already, some weeks before, treated the prosecutrix for some ailment, and he was called on the night in question because of that fact. He probably could be called, in justice, the family physician, and the jury might well have concluded

that he was not likely to be hostile to his patient. To what extent the errors committed at the trial may have conspired to prevent the jury from believing him it is impossible to say. The jury quite naturally gave willing ear to the story of the prosecutrix. The tendency of juries toward such a course is pointed out in *People* v. *Baldwin,* 117 Cal. 244 [49 Pac. 186]. To what extent did the errors at the trial aid this jury to give credence to the tale the prosecutrix told?

We said in our opinion that "questions addressed to witnesses at the trial plainly disclosed a theory of the defense that the marks and bruises upon the upper part of the body of Pats were self-inflicted and that those on her back, buttocks and upper legs were the result of corporal punishment by her parents." As to this very positive statement petitioner says that "there is no evidence at all, tending to support it." Here is the truth of the matter: The male physician, on his cross-examination, referred to "some bruises on the back . . . and some bruises too in the lower back region." The cross-examination then proceeded: "Q. Could you tell whether or not the bruise would be from a hand or whether it would be from some stick of some kind or club, that is, a small club? A. It could not be stated with surety. Q. In other words, if somebody had taken a nice sized paddle or club and beaten her up could you tell whether or not it was from that or whether or not it was from a hand, could you? A. No, I couldn't tell. Q. When you say you found bruises on her, that is, on the body and down—was that down across the buttocks? A. Yes. Q. Did you find some right across the buttocks? A. Yes, sir. . . . Q. . . . You found quite a few of them right across the back? A. Yes, sir. Q. And the ones you found across her back were running crosswise of her back? A. I don't think so. I think they were transverse. Q. Which way do you mean? A. In a direction of her ankle. . . . Q. You found them all the way down across the buttocks? A. Yes, sir." The prosecutrix was asked on her cross-examination whether she said to appellant, when he was taking her home on the night which is of interest here, that she was sure her father would beat her up for staying out so late. She answered: "No, I didn't say anything like that." After the female physician had referred to certain marks on the person of the prosecutrix the record goes on:

"Q. From the appearance of those scratches at the time you made the examination were they in a position on [her] body, that is, having reference to the length of her arm, that they could have been caused—I mean a place where she could have done it by putting her arm up on her own body? A. Yes, she could have reached, that is, on the anterior surface. Q. Were there any scratches that you examined on [her] that she could not have reached by her own arms or own hands? A. I think those over the left scapula region probably were some she might not have been able to reach."

Thompson (Ira F.), J., concurred.

Craig, J., dissented.

A petition by the respondent to have this cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 28, 1929.

Shenk, J., dissented.