[Crim. No. 2731. First Dist., Div. One. May 17, 1951.]

THE PEOPLE, Respondent, v. LEONARD MERRILL, Appellant.

Wm. E. Kidd and Charles O. Morgan, Jr., for Appellant.

Edmund G. Brown, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

BRAY, J.—From a conviction of rape with force and violence and an order denying his motion for a new trial, defendant appealed.

### Questions Presented

1. Was the prosecutrix' testimony inherently improbable?
2. Error in exclusion of testimony?
3. Error in denying probation?
4. Error in denying new trial?
5. Misconduct of district attorney?
6. Misconduct of judge?

1. *Prosecutrix' Testimony.*

Mary, aged 28, met defendant, aged 32, in September, 1949, at a garage where she kept her car and where he was employed. She saw and talked to him there frequently late at night when she came in with her car. She went out with him not over six times. She loaned him some money and on January 11, 1950, loaned him an additional sum. On April 20, 1950, he phoned her and asked her to meet him at a place called Steve's Club, stating that he would make a payment on what he owed her. After a few drinks they left and went to Mary's apartment. While Mary was seated on his lap defendant told her that due to an accident his testicles were damaged and he did not know whether or not he could have intercourse; that if they got married probably the only way they could have children would be through artificial semination. Mary went into the bathroom, and returning, found defendant lying face down on the davenport. She suggested that he leave. He said he wanted to stay all night. She told him no one could do that except her husband if she ever had one. He wanted her to undress. She refused. He then grabbed her arm, and hit her in the face. She started to scream. He grabbed her by the throat, shutting off the air so she could not breathe. He told her if she did not keep still that he would strangle her. He kept hitting her, pulled her on to the davenport, pressed his thumb into her eye, and stated that if she did not lie still and keep quiet he would push her eyes clear through her head. He then raped her.

Within an hour Mary phoned the police and reported the attack. Policemen came to her apartment and then took her to the emergency hospital. At approximately 2:10 a. m. she

was examined there by a doctor, who found redness in the pelvic region, a discharge present, a fresh laceration and bleeding of the hymen. There was a discolored area on her left upper eyelid; her neck showed some redness of the skin. The policemen testified to this same condition of the eye and neck. The doctor was of the opinion that Mary had not had sexual intercourse prior to this occasion. A specimen from the vaginal contents was taken and submitted to an expert who testified that it contained sperm.

Another expert testified that discolorations on the dress, slip and pants which Mary testified she was wearing at the time of the attack were human blood. Photographs taken the next morning were introduced in evidence, showing Mary's black eye, marks on her right shoulder and arm and on her chin and neck.

Defendant testified, in effect, to first meeting Mary at the garage and then to what amounted to a pursuit of him by Mary night after night when she came to the garage, culminating on one occasion in a sex experience with her in the storeroom of the garage, in which, however, he claimed there was no penetration (possibly because the condition of Mary's hymen the night of the assault would be difficult to reconcile with a completed act on the first occasion). Mary denied this incident *in toto*. On the night in question, when he called her to discuss his indebtedness to her, she insisted on meeting him at Steve's Bar. He accompanied her to the front door of her apartment house and left her there. He denied being in her apartment and all of the circumstances of the rape. He claimed that as she went in the door, he left, walked to the car line, waited for and boarded a streetcar, arriving home about 10 minutes to 1 a. m. He immediately went to bed, remaining there until late in the morning. A police officer testified that accompanied by another officer he arrived at defendant's address at approximately 2:30 that morning to ascertain if defendant lived there "but we received no response to the doorbell nor to a knock on the door."

Defendant contends that because Mary was angry at him for not repaying the money he had borrowed, she planned to get him into her apartment and then threaten him with a charge of rape, and when he failed to come in, she arranged to produce the evidence required to establish the fact. If this were true, she had to work rather fast to get someone to have intercourse with her between about 12 o'clock when defendant claims to have left her, and 1:30 to 1:45 when the radio car

operator received the police call to go to her apartment.

A letter she wrote to defendant's wife in February (defendant left the state in January and did not return until sometime in March) indicates that at that time she was quite bitter towards him. It tended to contradict her statement that she thought defendant was divorced.

The claim of improbability is based mainly upon the fact that after defendant talked lewdly to her and attempted to get her to agree to intercourse, Mary made no attempt to run away or arouse the neighbors in the adjoining apartment, and that after he started to attack her she did not cry out. Her testimony clearly shows that until he actually seized her she did not realize that he would attack her. Before she realized what was occurring he seized her throat, threatened her and hit her repeatedly, and also thrust his finger in her eye and threatened to push her eyes out. While she could have screamed, it is evident that she was afraid to. There was nothing inherently improbable in her story. "Proof of her vehement exertion was not necessary to show her resistance. When attacked by a rapist it is primarily for the woman to decide to what extent she can with safety resist. (*People* v. *Lay,* 66 Cal.App.2d 889, 892, 893 [153 P.2d 379].)

Where a trier of the facts decides that a prosecutrix' resistance was overcome by force or that she desisted in her struggle with the rapist by reason of her fear induced by his application of force, the finding necessarily follows that she did not consent to the intercourse." (*People* v. *Calliham,* 81 Cal.App.2d 928, 931 [185 P.2d 342].) Stress is laid on the fact that he told her that he was not sure he was virile, and it is claimed that it is inherently improbable that a man seeking intercourse would make such a statement. "The reviewing court may not reverse a judgment of conviction merely because the testimony of the complaining witness discloses circumstances which are unusual. To justify a reversal upon the ground specified by appellant it must hold that the testimony of the complaining witness is 'so . . . inherently improbable as to leave the court no recourse, without self-stultification, except to reverse the judgment.' (*People* v. *Moreno,* 26 Cal.App.2d 334, 336 [79 P.2d 390].) We find nothing inherently improbable in the testimony of the complaining witness in this case." (*People* v. *Stephens,* 66 Cal. App.2d 755, 757 [152 P.2d 1019].) Likewise, defendant argues that the girdle worn by Mary would have prevented the accomplishment of the act. There is nothing in the evidence

to support this conclusion. Nor is there anything inherently improbable in her testimony concerning defendant's statements. Most of defendant's arguments completely overlook the fact that the condition of Mary's hymen when examined that morning demonstrates that someone had intercourse with her, and her bruised condition demonstrates that force was used. ■ Moreover, "It is only where the testimony relied upon by the prosecution is so inherently improbable as to amount to no evidence at all that an appellate court is authorized to reverse a judgment (*People* v. *Stephens,* 66 Cal.App. 2d 755, 757 [152 P.2d 1019] ; *People* v. *Moreno,* 26 Cal.App.2d 334, 336 [79 P.2d 390] ), and contradictions or inconsistencies in the testimony of a witness do not render it inherently improbable within this rule." (*People* v. *Phillips,* 76 Cal.App. 2d 515, 520 [173 P.2d 392].) There were some minor discrepancies in her testimony and some exaggerations. However, as said in *People* v. *Carlisle,* 66 Cal.App.2d 874, 876 [153 P.2d 401], "Incompatibility and discrepancies in testimony, if any; the uncertainties of a witness in giving testimony, as well as contradictions in the evidence, are matters solely for the consideration of the trier of fact in the first instance and for the consideration of the trial judge on a motion for a new trial. Such matters cannot be considered by us if, as in the instant case, there is substantial evidence to support the findings of the jury. (*People* v. *Pianezzi, supra* [42 Cal.App.2d 265 (108 P.2d 732)].)"

### 2. *Exclusion of Testimony.*

■ On cross-examination Mary testified that the drinks she had that night at Steve's Club were ordered for her by defendant, and were four in number. Defendant then asked : "There were no other drinks ordered for you or by you during the time Mr. Merrill was out of the bar? A. I have never in my life ordered a drink in any bar of liquor." Later on, defendant asked if Steve's Bar was the only bar she had been in; if she had not been in there the day before the trial started, and if within the last 12 months she had not been in certain Eddy Street bars. The court sustained objections to these questions as not material. Defendant then offered to prove that since the date of the alleged attack she had been in a number of bars in San Francisco's tenderloin district, unescorted, ordering drinks. The court sustained an objection to the offer of such evidence. Defendant contends he was thereby erroneously restricted in his cross-examination of

prosecutrix in that such evidence was admissible in impeachment of her statement that she had never in her life ordered a drink in a bar and also that it would tend to prove her unchastity. It is not "within the proper scope of impeachment to show that a witness has given false testimony as to a matter which could not be proved independently in the case." (*People* v. *Wells*, 33 Cal.2d 330, 340 [202 P.2d 53].) Evidence that Mary ordered drinks could not have been proved independently on the issues involved in this case.

▇▇▇ Defendant contends that this evidence was admissible on another ground, namely, to prove unchastity. ▇▇▇ Proof of unchastity is admissible in a case where the charge of rape is by force and violence. ▇▇▇ Assuming that frequenting bars would be evidence of unchastity, it does not appear how frequenting bars after the attack would be material. These questions and the offer of proof were directed towards Mary's actions subsequent to the attack. Obviously her acts in this respect subsequent to the attack would not be material. But a more important answer to the contention is that mere frequenting of bars does not tend to prove unchastity. Defendant relies principally on the case of *People* v. *Biescar,* 97 Cal. App. 205 [275 P. 851], where the court said "the prosecutrix in a rape case may be subjected to an unusually thorough, searching, and protracted cross-examination" (p. 217). This case is not authority for the contention that mere presence in bars is evidence of a woman's unchastity. In the instant case defendant was permitted to, and did, conduct an unusually thorough, searching and protracted cross-examination of Mary. In these days when women patronize bars as freely as men, the language of *People* v. *Mangum,* 31 Cal.App.2d 374 [88 P.2d 207], is peculiarly appropriate. There, in distinguishing earlier cases which seemed to hold that drinking by women in bars, or their presence there, indicated their unchastity, the court said (p. 382) : ". . . we are permitted to take judicial notice of customs and the ordinary affairs of life. It must be conceded that habits and social customs have altered since the origin of the rule mentioned, so that, in many respects, its application, as set forth in the earlier cases, would be a grotesque anachronism." The court there held that the prosecutrix could not be asked if frequently she had been intoxicated in public bars.

The court did not err in refusing to allow the questions concerning Mary's presence in bars subsequent to the attack. "In this state in cases of this character the rule is that evi-

dence of the unchastity of the prosecutrix is admissible as bearing on the question of consent, but evidence of her moral delinquency is inadmissible as affecting her general credibility as a witness.'' (*People* v. *Murphy,* 53 Cal.App. 474, 481 [200 P. 484].)

A more serious situation arises concerning the exclusion of the testimony of the witness Patricia McCrea. Mary testified that on May 2d (about 12 days after the attack) defendant phoned and asked her if she had sworn out a warrant for his arrest on a charge the name of which he did not want to use as it was a bad word—''You know what I mean.'' He then attempted to persuade her not to go on with the matter but to see his lawyer. Defendant admitted making the phone call but stated that he told her that he had heard that she was trying to get him on this charge and asked if it were true. He claimed she replied that there was nothing to what he had heard. Thus, there was a direct conflict between the two versions of this conversation. The prosecution obviously offered Mary's version of it to show a consciousness of guilt on the part of defendant. Defendant's version was to explain the call as being based on information given him, rather than on a consciousness of guilt. To corroborate his claim of source of knowledge defendant produced Mrs. McCrea, a cousin of his wife's, and attempted to obtain from her testimony to the effect that prior to his phone call she told defendant and his wife that Mary had sworn to a warrant for his arrest. Apparently that is what defendant expected Mrs. McCrea to testify to, although there is no definite offer of proof to indicate just what Mrs. McCrea would testify. However, in the discussion between court and counsel it is apparent that defendant wanted some information from the witness which would tend to offset the consciousness of guilt deducible from Mary's version of the phone call. Plaintiff objected and the court sustained objections on the ground of hearsay to the only questions asked of Mrs. McCrea, namely, did she give the Merrills some information about a rape case and where did she get the information she gave the Merrills? While, strictly speaking, the testimony solicited would be hearsay, it was necessarily of a type to which the hearsay rule could not apply. As the prosecution introduced the phone call on the theory that defendant was conscious of his guilt and because of such consciousness phoned Mary and tried to persuade her not to proceed, defendant had the right to show, if he could, that his call did not come from con-

sciousness of guilt but from information given him by another, and then to corroborate his testimony by that other. Therefore the evidence should have been admitted. ▉ In view, however, of the overwhelming proof of defendant's guilt, the error, under section 4½ of article VI of the Constitution was not prejudicial. The incident of the phone call was merely cumulative. In spite of defendant's contention that Mary's story was inherently improbable, and of a few slight contradictions in it, a reading of her testimony and particularly the exceedingly detailed and protracted cross-examination of her, supports the conclusion that reasonably the jury could have done nothing other than convict. Defendant's own story is the more improbable of the two. Defendant presented a picture of Mary as a woman who had pursued him night after night, allowed certain intimacies, and on one occasion had been the aggressor in a sex experience. Such a situation is irreconcilable with his claim of leaving her at the front door of her apartment building on the night when, almost immediately thereafter, she is raped.

### 3. *Denial of Probation.*

▉ At the time of the hearing and denial of the motion for new trial defendant moved for probation. The court denied the motion, stating that it had no authority to grant it, apparently referring to section 1203 of the Penal Code which prohibits probation to one who in the perpetration of the crime wilfully inflicted great bodily injury or torture. However, there was considerable discussion as to granting of probation which was not reported, so it is not clear that probation was denied solely on this ground. Later, on hearing the presentence report of the probation officer, the court stated that it was convinced "an element of torture was used upon the victim" and then stated that defendant was not eligible for probation. It then stated, among other of its reasons for denying defendant a county jail sentence only, that Mary "was grievously injured, physically—undoubtedly mentally too." Defendant contends that the evidence does not support a finding of great bodily injury or torture and hence the court erred in assuming that it had no power to grant probation. (If it was acting in any degree in the exercise of its discretion, its denial of probation was amply justified.) Assuming, however, that the court denied probation solely on the ground of lack of power, the injuries testified to by Mary, supported by the bruise marks on her body and particularly the gouging

of her eye, are sufficient evidence to justify a finding of great bodily injury and torture. Defendant contends that these injuries were no more than those necessary to constitute the force and violence required to prove the charge, and not the great bodily injury or torture mentioned in the probation section. However, here there was more than just force or violence. When the defendant struck Mary and placed his thumb in her eye, and threatened to continue to do so unless she yielded, there was sufficient torture to bring the case within the inhibition of the statute.

Moreover, the court heard Mary's testimony and that of the doctor as to her injuries, and saw the photographs of the marks. As said in *People* v. *Harshaw*, 71 Cal.App.2d 146 [161 P.2d 978], where the trial court refused to grant probation on the ground that a deadly weapon had been used, the question was one of fact for the trial court. "Each case is to be adjudged by its own facts, and, in the instant case, the trial judge who heard the case had determined that it is not a case in which probation should be granted." (*People* v. *Darrow*, 212 Cal. 167, 186 [298 P. 1].)

4. *Denial of New Trial.*

 There is no basis for the contention that defendant was entitled to a new trial. In fact, the affidavits filed on the motion and upon which defendant relies show no newly discovered admissible evidence, nor any reason why the inadmissible evidence referred to in the affidavits was not available at the time of trial. The affidavits were by defendant's attorney and one Maguire to the effect that subsequent to the trial they interviewed a Mrs. Panch who resided at the same place as defendant, and were informed by her that on the morning of the assault at the time when the police officer claimed to have rung the doorbell and knocked, she was asleep in the front room with only a light wall between her and the front door, and was not awakened. She said she would have heard the bell had it been rung as she was a light sleeper; the bell was a loud one, and she was anxious about her son when he was not home; moreover, that on that night and every night thereafter for about 12 nights, defendant was at home; that Mrs. Panch and Mrs. Drady, Mrs. Panch's sister-in-law, stated that a police officer, Inspector Breen, had called upon them about a week before the trial and they had informed him of this fact and also that Mrs. Drady had stated that both her sister and her son were at defendant's home

the morning of the assault. (The affidavit does not state whether or not the latter claimed not to have heard the bell.)

There is no showing in either affidavit why the evidence could not have been produced at the trial. If defendant did not know before the trial, he there learned that the police officers claimed to have gone to his home. It would have been a simple matter for defendant's counsel to inquire of Mrs. Panch if she had heard the officers. Thus the first requirement of a showing to obtain a new trial was not met. As said in *People* v. *Coleman*, 83 Cal.App.2d 812, 817 [189 P.2d 845], ". . . no satisfactory showing was made as to why in the exercise of due diligence it could not have been discovered sooner and presented at the trial."

Moreover, the affidavits were hearsay. There is no statement from any of the persons referred to that she would testify as indicated. The affidavits merely set forth the deponent's conclusions as to what she would testify. *People* v. *Thompson*, 5 Cal.App.2d 655 [43 P.2d 600], holds that affidavits which set forth only conclusions of the affiant are not sufficient to justify the granting of a new trial. The fact that the alleged witnesses refused to give defendant's attorneys affidavits is no reason for considering their conclusions as to what their testimony might be. Defendant could have subpoenaed them to the hearing of the motion for new trial. The refusal of the proposed witnesses to make affidavits and the failure of defendant to subpoena them supports the court's refusal to grant a new trial on the grounds that the alleged evidence was "speculative" and "conjectural." These affidavits are of the kind condemned in *Riviello* v. *Journeymen Barbers etc. Union*, 88 Cal.App.2d 499 [199 P.2d 400], where this court said (p. 503): "It is well settled that affidavits made upon information and belief as to facts that have transpired are hearsay and must be disregarded." Testimony of affiants as to what Mrs. Panch and Mrs. Drady told them would not be competent evidence; hence their affidavits did not constitute competent evidence and could not be considered. (See *Gay* v. *Torrance*, 145 Cal. 144 [78 P. 540].) "A motion for a new trial based upon the claim of newly discovered evidence is universally looked upon with distrust and disfavor [citations] and much must be left to the discretion of the trial court in granting or denying a motion for a new trial on that ground or any other ground. Where the trial court refuses to grant a new trial, an appellate court should not interfere except upon a clear showing of an abuse of discretion by the trial

court. [Citations.]'' (*People* v. *Mandell,* 48 Cal.App.2d 806, 818 [120 P.2d 921].) We find no showing of an abuse of discretion in the present case.

5. *Alleged Misconduct of the District Attorney.*

██ This claim is based upon the statement in the above-mentioned affidavits that Inspector Breen was told that there were three people in the house who could have heard the bell had it been rung. It is then assumed that the deputy district attorney in charge of the trial had learned of this fact from Inspector Breen, and in spite of it, introduced in evidence the testimony of the officer who claimed to have rung the bell. There is nothing in the record to substantiate the claim that the deputy had this information. We have no way of knowing if it was the fact. The refusal of the women to make affidavits is significant. The hearsay affidavit of counsel does not establish it. Again, had the deputy known it, he may have had reasons for doubting its credibility.

██ The second charge of misconduct is based upon certain comments made by the district attorney in his argument. ██ Defendant has not pointed out the comment to which he objects. Because of this failure we could decline to consider the matter. (*People* v. *Hadley,* 175 Cal. 118 [165 P. 442].) ██ However, so that counsel's dereliction will not react upon the defendant, we have examined the record. We assume it is when the district attorney said in discussing defendant's ''interminable'' cross-examination of Mary, ''It was an attempt to see which way the evidence would go, and then make an election, whether or not to claim, 'Yes, I was there, but it was done by consent,' or to say, as he did say 'I wasn't there.' '' No objection to this statement was made at the trial. Defendant contends that because at the time of his arrest defendant claimed he was not in the apartment, and because defendant had intimated in his examination of the jurors he might have inconsistent defenses, this statement was misconduct. We are unable to follow the logic, if any, of this contention. Moreover, it was justified by the type of cross-examination. We have read it. It is extremely lengthy, and gives the impression that the cross-examiner was trying to show (1) that Mary had not had intercourse with anyone that night; (2) that if she had, it was with her consent; (3) that if she had, it was not with defendant. Even though defendant when first arrested stated that he had not been in Mary's apartment, and defendant, in examining jurors on

their *voir dire,* intimated that an alibi was to be the defense, the cross-examination gave rise to an inference along the lines of the district attorney's comment. "Reasonable inferences may be drawn from the evidence by counsel in the course of argument." (*People* v. *Hoyt,* 20 Cal.2d 306, 318 [125 P.2d 29].) We see no misconduct of the district attorney in commenting on the cross-examination. Again there was no objection,to it. ". . . it has long been the rule in this court that a claim of misconduct on the part of the district attorney or the trial judge will not ordinarily be considered on appeal, unless the complaining party has promptly called the attention of the court to the alleged impropriety and assigned misconduct thereon. [Citations.] The reason for this rule is that the court should be given the opportunity to correct the irregularity or to prevent any prejudicial effect, if that be possible." (*People* v. *MacDonald,* 167 Cal. 545, 551 [140 P. 256].) Defendant contends it was the type of comment which is referred to in the Macdonald case as follows (p. 551) : "There may, of course, be cases in which the act done or remark made is of such a character that a harmful result could not be obviated by any retraction or instruction. In such cases the misconduct will furnish ground for reversal, even though the court may have taken immediate steps to correct any impression improperly conveyed to the jury. (*People* v. *Derwae,* 155 Cal. 592 [102 P. 266].) For like reasons, the want of an assignment of misconduct should not affect appellant's rights, where such assignment could not have led to the curing of the harm done."

The following language from *People* v. *Albright,* 87 Cal. App.2d 222, 225 [196 P.2d 800], applies here : "In the present case an objection and assignment of misconduct could have cured any error, if error occurred." The comment, if not well founded, "could have been reframed or eliminated and a proper cautionary instruction given to the jury." It obviously was not of such type,. and as above stated, there was justification for it.

### 6. *Action of the Judge.*

 While defendant makes no specific assignments of misconduct (here again we call counsel's attention to the rule that we are not required to consider objections so presented (*People* v. *Hadley, supra,* 175 Cal. 118)) he contends that there were too many interruptions by the court, particularly of the cross-examination of Mary, and that in the latter case, it gave the witness time to "consider how best to answer."

We have examined the record, and while there were many interruptions by the court, with possibly the exception of one or two instances which could be attributed to a misunderstanding of the question by the court, they were all in the interests of clarity. The almost interminable cross-examination, with questions concerning the night of the assault, intermingled with questions concerning other occasions, justified the action of the court in requiring that it be clear to the witness and to the jury which occasions were being inquired about.

The judgment and order are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.