[Crim. No. 38365. Second Dist., Div. Five. Feb. 26, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
REGINALD SCOTT, Defendant and Appellant.

**COUNSEL**

Dennis L. Cava, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ASHBY, J.**—Defendant was charged with murder in violation of Penal Code section 187. He pled not guilty and not guilty by reason of insanity. A jury found defendant guilty of murder in the second degree and found him sane. He was sentenced to state prison.

On the night of October 16-17, 1979, defendant, a dentist, picked up a hitchhiker and took her to his office for the purpose of having sex. There he bludgeoned her to death with approximately 16 blows to the head with a metal pipe which was a tool in his laboratory. Defendant disposed of the body in an industrial trash dumpster about a mile and a half from his office. He disposed of the pipe and the victim's personal belongings in a different dumpster about three miles away. He attempted to clean up bloodstains at the office, then opened the office for employees at 9 a.m., explaining that other bloodstains were from a cut finger. When one of the employees found a two-inch piece of scalp on a table, defendant took it from her and walked out, saying she was crazy to call it a piece of scalp.

Defendant testified to a diminished capacity defense. He had been drinking both before he picked up the victim and with the victim at the office. When they undressed for sex, they had an argument about the victim's personal cleanliness. She felt insulted and started yelling names at him and defendant picked up the pipe and kept hitting her. During his fury he heard in the back of his mind, "Just kill, kill!" He described how he then disposed of the body, the personal belongings and the weapon, and attempted to clean up the office.

Various witnesses testified to defendant's history of excessive drinking, abusiveness toward women, and other psychological problems. Drs. Kivowitz and Trockman gave their opinions that defendant was legally sane but had diminished capacity. Drs. Malkin and Vicary also expressed opinions that defendant had diminished capacity.

In rebuttal Dr. Markman testified for the prosecution that in his opinion defendant was legally sane and had the capacity to commit second degree murder, although he lacked the capacity to commit first degree murder.

At the sanity phase of the trial it was stipulated that the jury could consider all the evidence during the guilt phase, and Dr. Davis testified for the defense that in his opinion defendant was legally insane.

Defendant's contention that he should have been found insane on the basis of Dr. Davis' "uncontroverted" testimony is without merit, because under the stipulation the jury in the sanity phase could also consider the opinions of Drs. Kivowitz and Trockman that defendant

was sane. Substantial evidence supports the finding of sanity. (*People* v. *Drew* (1978) 22 Cal.3d 333, 349-351 [149 Cal.Rptr. 275, 583 P.2d 1318].)

■ Defendant similarly contends there is no substantial evidence to contradict his defense of diminished capacity. Dr. Markman's testimony supports the judgment. The conflict between the testimony of the other doctors and the testimony of Dr. Markman, together with the other circumstances surrounding the crime, was solely for the jury to resolve. (*People* v. *Cruz* (1980) 26 Cal.3d 233, 251 [162 Cal.Rptr. 1, 605 P.2d 830]; *People* v. *Foster* (1980) 102 Cal.App.3d 882, 895 [162 Cal.Rptr. 623]; see *People* v. *Poddar* (1974) 10 Cal.3d 750, 759 [111 Cal.Rptr. 910, 518 P.2d 342]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738].)[1]

■ Defendant next contends the trial court erred in excluding evidence of a conversation defendant had (the time not being specified in the offer of proof) with a friend of his, another dentist, which purportedly "would have painted a clearer picture of the mental anguish that appellant was experiencing even before the killing." Even assuming that the evidence had minimal probative value, it was properly excludable under Evidence Code section 352.[2]

■ Defendant next contends that the prosecutor committed misconduct in argument to the jury. There was no reversible error. When the prosecutor erroneously stated that the burden of proof was on the defendant to prove diminished capacity, defendant's objection was sustained, the jury was admonished to disregard that statement, and the

---

[1]Defendant seizes upon and exaggerates the importance of a statement by Dr. Markman that, "I think clearly this event would not have happened had Dr. Scott been sober." This was in the context of Dr. Markman's opinion that because of his alcohol consumption that night defendant lacked the capacity to premeditate in order to be guilty of first degree murder. This did not change Dr. Markman's opinion that defendant had the capacity to harbor malice, to form the specific intent to kill, and to be aware of his duty to act within the law. (*People* v. *Poddar, supra,* 10 Cal.3d at p. 758.)

[2]The other dentist had himself been institutionalized from 1958 to 1961 for a nervous breakdown, and had written a book about his experience entitled, "All the Hairs on My Head Hurt." The offer of proof was that he and defendant had a conversation in which defendant "recognized symptoms and moods in himself that were closely allied to the same problems that led to this witness' confinement." The problems defendant had experienced in the past were amply explored in other far more direct evidence from other doctors defendant had consulted. In fact, a Dr. Lunceford testified that defendant had told him a friend had written a book "All the Hair on My Head Hurts" and that the title best described the kind of pain defendant felt.

jury was correctly instructed on the burden of proof, curing any harm. ▮ The other assignment of misconduct involved a debate between defense counsel and the prosecutor in arguments to the jury about which side should have produced as a witness defendant's girl friend Joyce, who was with defendant earlier in the evening and early the following morning. It was proper for the prosecutor to argue that Joyce was a logical witness to defendant's intoxication who should have been produced by the defense. If the prosecutor went too far by suggesting that Joyce had refused to talk to the police and that defense counsel had prevented the prosecutor from bringing out this fact on cross-examination of defendant, defense counsel made no objection to this line of argument nor did he request that the jury be admonished. A timely admonition could have cured any harm, and therefore the point is deemed waived (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468]), and in any event the argument on this point did not materially contribute to the verdict. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

▮ Finally, defendant contends the trial court erred in denying his motion for new trial based on juror misconduct. His attempted showing on the motion for new trial was that one or more newspaper articles were in the jury room during deliberations. The articles did not concern evidence of the instant case but deliberations by the Legislature on the diminished capacity and insanity defenses. However, defendant produced no competent evidence that the newspaper articles were in the jury room or had been examined by the jurors. Defendant produced no affidavit from any juror that such event occurred. Instead he presented declarations from two defense investigators who had contacted the jurors after the trial, containing hearsay declarations that at least one such newspaper article was brought to the jury room by a juror and examined by some of the jurors.

None of the jurors, however, would give an affidavit to that effect. Defendant's suggestion that counsel was incompetent in failing to secure affidavits is not supported by the record. This was due not to lack of effort by counsel but the unwillingness of the jurors to give an affidavit. (*People* v. *Pope* (1979) 23 Cal.3d 412, 429 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Defendant subpoenaed all 12 jurors to come to the hearing on the motion for new trial. Defendant contended that he had the right to subpoena the jurors and to compel them to testify on the issues relating to the motion. The trial court ruled to the contrary, and held that pursuant to the public policy of this state recognized in

*Linhart* v. *Nelson* (1976) 18 Cal.3d 641, 644-645 [134 Cal.Rptr. 813, 557 P.2d 104], the jurors could not be subpoenaed and compelled to testify at the hearing.

Defendant contends that this ruling was erroneous, and that the policy declared in *Linhart* v. *Nelson* applies only to civil cases. We hold the trial court was correct.

In *Linhart*, a personal injury case, the defendant moved for new trial on the basis of jury misconduct and subpoenaed three jurors to testify at the hearing. The trial court refused to admit testimony and denied the motion. The Supreme Court affirmed, holding there was no right to subpoena jurors to testify in support of a motion for new trial. Although the Supreme Court referred to Code of Civil Procedure section 658, which states that the motion for new trial on certain grounds "must be made upon affidavits," the Supreme Court also gave strong public policy reasons for its unanimous opinion. "[P]ermitting jurors or other witnesses to testify for one party would mean that opposing parties— unaware of the proposed testimony—would be obligated to subpoena all jurors and all other witnesses in preparation for hearing. [¶] Moreover, permitting counsel for the losing party to interrogate unwilling trial jurors touches the integrity of our venerable jury process. First, once aware that after sitting through a lengthy trial he himself may be placed on trial, only the most courageous prospective juror will not seek excuse from service. Secondly, if jury deliberations are subject to compulsory disclosure, independent thought and debate will surely be stifled." (*Linhart* v. *Nelson, supra*, 18 Cal.3d at pp. 644-645.)

These policies are at least equally applicable to criminal proceedings. The trial court in this case noted that jurors are routinely informed after their verdict is rendered that it is entirely up to their own discretion whether they wish to discuss the case with the attorneys. Here the defense investigators even went to the homes of a number of jurors and, when the jurors either refused to discuss the matter or to give an affidavit, served them with subpoenas. To grant this kind of power to the losing attorney would open the door to harassment of jurors and, as the court feared in *Linhart*, ultimately damage the jury process and the administration of justice. Although Penal Code section 1181 differs in language from Code of Civil Procedure section 658, this difference is not legally significant. The public policy recognized in *Linhart* precludes subpoenaing jurors to compel their testimony on a motion for new trial in a criminal case.

*People* v. *Pierce* (1979) 24 Cal.3d 199, 206, footnote 3 [155 Cal.Rptr. 657, 595 P.2d 91], cited by defendant is not to the contrary.[3] In *Pierce*, a juror, Seymour, was personally acquainted with one of the investigating policemen, Officer Case. Seymour approached Officer Case at his home and asked him various questions about the crime. After the verdict, one of Officer Case's supervisors overheard him discussing his prior contact with Seymour, and the matter was investigated by the police department and the district attorney. A new trial motion was made, which the trial court decided on the basis of the investigators' reports. In reviewing the trial court's denial of the motion, the Supreme Court commented, in a footnote, that although incompetent testimony such as hearsay, if received without objection, takes on the attributes of competent proof, "we strongly disapprove of the substitution of unsworn police reports and summaries for affidavits or testimony of the percipient witnesses. A hearing in open court would have been particularly appropriate to ascertain the relevant facts in this matter, because both Seymour and Case were initially evasive about the scope and content of their conversation. (But cf. *Linhart* v. *Nelson* (1976) 18 Cal.3d 641 [134 Cal.Rptr. 813, 557 P.2d 104] [stating rule in civil cases].)" (*People* v. *Pierce, supra,* 24 Cal.3d at p. 206, fn. 3.)

The court's reference to *Linhart* was not a holding that jurors may be compelled to testify at a motion for new trial in a criminal case. The facts in *Pierce* were such that the misconduct of the juror could be proved by the affidavit or testimony of a nonjuror. Similarly in the instant case, the trial court's ruling did not prevent defendant from presenting competent evidence that the jury had the newspaper article in the jury room, but defendant had none to offer, except the hearsay reports of the investigators, to which there was a timely objection.[4] The trial court properly denied the motion for new trial.

---

[3]*People* v. *Merrill* (1951) 104 Cal.App.2d 257, 268 [231 P.2d 573], which was not cited by defendant, is discussed in the dissent, but is not relevant at all. The motion for new trial in *Merrill* was based on newly discovered evidence, not juror misconduct, and the witnesses in question were not jurors.

[4]At the beginning of the hearing defense counsel commented that he thought one or two of the jurors were in the audience. Defendant argues on appeal that it should be inferred these jurors were willing to testify voluntarily, since the trial court stated that it had instructed the clerk to call all of the subpoenaed jurors and inform them that they were not required to honor the subpoena. If they were willing to testify voluntarily, counsel did not so inform the court. Counsel asked permission of the court to call those jurors who were present, but this was in the context of his argument that he had the right to compel their testimony.

The judgment is affirmed.

Hastings, J., concurred.

**STEPHENS, Acting P. J.,** Concurring and Dissenting.—While I concur with the bulk of the majority opinion, for a fuller understanding of the issues the facts and analysis of the various issues is deemed proper to restate. I do not agree with the law as stated by the majority as it relates to proof of juror misconduct and a different result should prevail.

Defendant was charged with murder in violation of Penal Code section 187. He pled not guilty and not guilty by reason of insanity. A jury found defendant guilty of murder in the second degree and found him sane. Several doctors testified as to defendant's alleged diminished capacity and as to his sanity.

There is no contention that defendant did not bludgeon the victim to death with an iron pipe, and attempt to dispose of the body in a location miles from the scene of the crime. He also attempted to clean up the telltale bloodstains. With such uncontroverted basic facts it would usually be unnecessary to dwell upon the evidentiary facts, but since the circumstances surrounding the crime affect the diminished capacity defense and the insanity phase of the case, some detail is required.

The victim was first observed by defendant to be hitchhiking and he picked her up in his car. Defendant testified as to excessive drinking, both before and after the pickup. The victim also indulged in alcohol and the autopsy established she had a blood alcohol level of .28, corroborating the claim that she had been highly intoxicated. The time of death was established as the night of October 16-17, 1979. Defendant and the victim went to the defendant's office[1] and, according to defendant, continued drinking until they agreed to have sex, at which time she undressed. Defendant testified that an argument ensued about bodily cleanliness and ended in defendant's obtaining the iron pipe and hitting the victim some 15-16 times in the head.[2] Defendant heard a voice in his head saying "kill, kill."

---

[1]Defendant was a dentist.

[2]Bruises, a broken finger and an eyebrow laceration were observed at the autopsy. The bruises were on the arm, shoulder, knees and leg of the victim.

After the blows the body was moved around 3 a.m. to 4 a.m. in a trash bag and transported some three miles and placed in a trash bin. The pipe and clothing of the victim were disposed of elsewhere. Defendant testified he did these things "not knowing" what he was doing. All identification was removed from her person at the scene. Defendant returned to his office around 5 a.m. and slept in his car until 7 to 8 a.m. when he entered the office, partially cleaned up the blood from various places in the office and changed his blood-splattered clothes. (The clothes were taken to his home on October 18.) He then left to pick up "Joyce" at 8-8:30 a.m. and returned to the office about 9 a.m. and admitted employees. He directed a further cleanup and stated the blood had come from a cut finger.

Defendant testified at length about his ingestion of alcohol and his intoxication. Other witnesses testified as to defendant's excessive drinking and the adverse effect it had upon him, including abusiveness toward women. Several doctors gave their medical opinions as to defendant's mental state at the time of the killing. Dental assistant Nagano, one of the witnesses, testified that the defendant let her into the dental office at 9 a.m., October 17;[3] that he was dressed in a customary manner, and that he did not appear to be drunk or under the influence of anything. She testified that in addition to seeing blood on the floor and walls, she saw a two-inch piece of scalp on a table in the office reception room. Defendant took the item, saying that the person claiming it to be scalp was crazy. Defendant walked away with the item.

The pipe which was used in the killing was kept in the laboratory, on a shelf, and it was there on October 16th but missing on the 17th.

A Dr. Markman was appointed by the court to examine defendant and he did so. The doctor concluded that defendant had the mental capacity to commit the crime for which he was convicted. Other doctors also examined defendant and arrived at a different conclusion. It is apparent that the jury resolved any conflict in the evidence given by experts in favor of the prosecution.

As to the insanity phase of the case, the jury, by stipulation, considered all evidence received on the guilt phase plus another doctor

---

[3] Other employees, Maria Diaz, Rosa _____ , and Joyce _____ , were stated to have been present when Nagano first observed blood and the piece of scalp. Maria also testified to similar facts in corroboration of Nagano.

produced by the defense. This doctor concluded defendant was insane at the time of the offense. The jury again resolved the issue against defendant.

Defendant's first contention is that the evidence was insufficient to support the jury's conclusion. Penal Code section 187 establishes that second degree murder is the unlawful killing of a human being with malice. A specific intent to kill is not a required element of second degree murder. (*People v. Gorshen* (1959) 51 Cal.2d 716, 732-733 [336 P.2d 492] [a point of evidence in this case was subsequently disapproved].) An assault with a deadly weapon suffices when a killing results, for malice may be implied. The teachings of *People v. Lines* (1975) 13 Cal.3d 500, 505-506 [119 Cal.Rptr. 225, 531 P.2d 793], are equally applicable to the case before us. There the court said: "While it is true that defendant's statement in large part might preclude a finding of malice, there is in the record ample evidence to the contrary supportive of a finding of implied malice. It is settled that the necessary element of malice may be inferred from the circumstances of the homicide. (*Jackson v. Superior Court* (1965) 62 Cal.2d 521, 525 [42 Cal.Rptr. 838, 399 P.2d 374].) 'Such malice may be express or implied.... It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (Pen. Code, § 188.) Thus this court has declared that '[w]hen the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree. [Citations.]' (*People v. Howard* (1930) 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385]; see also *People v. Wells* (1938) 10 Cal.2d 610, 616-617 [76 P.2d 493].) Accordingly, in *Jackson v. Superior Court, supra*, we pointed out that when it is proved that the defendant assaulted the victim with a deadly weapon in a manner endangering life and resulting in death, '"malice is implied from such assault in the absence of justifying or mitigating circumstances."' (62 Cal.2d at p. 526.)"

While it is true that the specific mental state necessary to the commission of second degree murder may be negated by diminished capacity (*People v. Poddar* (1974) 10 Cal.3d 750, 757 [111 Cal.Rptr. 910, 518 P.2d 342]), the question of the extent and effect of voluntary intoxication and whether it sufficiently diminished defendant's capacity is a factual question for the jury. Here there was conflicting expert evidence on the issue and it cannot be held that the jury erred. (*People v.*

*Johnson* (1980) 26 Cal.3d 557, 575-576 [162 Cal.Rptr. 431, 606 P.2d 738].) There is no need to repeat the above stated facts in a more detailed discussion establishing the prerogative of the jury to find that malice existed. Suffice it to say that under the testimony of the dental office employees as to defendant's apparent sobriety at 9 a.m., within some six or seven hours of the crime, the jury could have discounted the testimony given by defendant. Also, subsequent acts by defendant further support such negativing of the claimed diminished capacity due to alcohol either ingested immediately before the killing or the result of long-time use thereof. (See *People* v. *Johnson, supra*, 26 Cal.3d at pp. 577-579.)

Defendant claims there was error in the finding of sanity. There was conflicting evidence; some was produced during the guilt phase and some for the first time at the sanity hearing. Both were for the jury's consideration. They resolved the conflict between the conclusions of the experts.

Defendant argues relevant evidence was erroneously excluded. The question posed to a defense witness who had written a book "All the Hairs on My Head Hurt" was: "Now, after that [referring to release from a hospitalization due to severe depression], did you have conversations with [defendant] about the problems that led to your institutionalization?" The prosecutor objected on the ground of relevancy. The court was correct, but even were it admissible there would be no need to reverse, for such exclusion was harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendant contends there was prosecutorial misconduct. This argument centers on the nonproduction of Joyce, who had purportedly been with defendant both before the killing and afterward. The prosecutor made reference that the defense attorney had kept such a witness' testimony out of the case. The People argue here that there was no objection at the time of the alleged misconduct. The error did not reach the level requiring reversal. (*People* v. *Watson, supra*, 46 Cal.2d at p. 836.) It was patently obvious that a prime potential and available witness was not produced and it was appropriate argument that she was available to the defense. The prosecution may properly refer in argument to reasonable inferences from established facts.

Defendant claims a reversal is required by a juror's objective ascertainable fact of misconduct. (*People* v. *Hutchinson* (1969) 71 Cal.2d

342, 350 [78 Cal.Rptr. 196, 455 P.2d 132].) The contention, raised on a motion for a new trial, is based upon an attempted showing that newspaper articles were in the jury room during deliberations. (See *People* v. *Wong Loung* (1911) 159 Cal. 520, 526 [114 P. 829]; *People* v. *Lessard* (1962) 58 Cal.2d 447, 454 [25 Cal.Rptr. 78, 375 P.2d 46].) The articles did not concern evidence of the instant case but legislative considerations of the diminished capacity and insanity defenses. No jurors' affidavits were produced and the court refused to permit the calling of the jurors present to testify. (See *Linhart* v. *Nelson* (1976) 18 Cal.3d 641, 644-645 [134 Cal.Rptr. 813, 557 P.2d 104].)[4] Some of the jurors were present at the time of the motion for a new trial, having been subpoenaed by defendant. The court was in error in refusing the proffered testimony. It is unnecessary here to determine whether a juror could refuse to testify when called. It is necessary to conclude that testimony of a juror would be admissible and the court here erroneously prohibited the production of such evidence.

Code of Civil Procedure section 658 provides: "When the application [for new trial] is made for a cause mentioned in the first, second, third and fourth subdivisions of the last section, it must be made upon affidavits; otherwise it must be made on the minutes of the court."[5] The wording of this section has remained since at least 1879 and perhaps since 1874, and in *Saltzman* v. *Sunset Tel. etc. Co.* (1899) 125 Cal. 501, 503 [58 P. 169], it was stated that "[a] deposition ..., taken in open court, must be regarded as an affidavit." In *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 793-794 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717], a unanimous court stated: "Although we find no authority for the reception of oral testimony at the hearing on a motion for new trial, except in a case in which a necessary witness has refused an affidavit or deposition (*Saltzman* v. *Sunset Tel. etc. Co.* (1899) 125 Cal. 501, 503 [58 P. 169]), we do not regard the procedure of proof as jurisdictional in nature. [Citations.]" In *Linhart* v. *Nelson, supra*, 18 Cal.3d 641, 645, a unanimous court said: "We conclude that a motion for new trial on grounds enumerated in the first four subdivisions of section 657 must be presented solely by affidavit. Insofar as it is con-

---

[4]The affidavits presented by the attorneys were refused as evidence for they were from investigators only and, hence, hearsay as well as reciting thought processes. Further, the court ruled: "But there is no competent evidence before the court at this time that any newspaper was before this jury at all during the deliberations."

[5]The "second" subdivision of Code of Civil Procedure section 657 relates to jury misconduct.

trary, *Saltzman* v. *Sunset Tel. etc. Co.* (1899) 125 Cal. 501 [58 P. 169], is overruled.²"

In criminal cases, however, defendant correctly argues that the rule set down in *Linhart* is inapplicable and that in-court testimony may be taken on a charge of juror misconduct. In support of this contention, with which I agree, defendant relies upon *People* v. *Pierce* (1979) 24 Cal.3d 199, 206, footnote 3 [155 Cal.Rptr. 657, 595 P.2d 91]. There the unanimous court said: "Although 'incompetent testimony, such as hearsay . . ., if received without objection takes on the attributes of competent proof' (*Berry* v. *Chrome Crankshaft Co.* (1958) 159 Cal. App.2d 549, 552 [324 P.2d 70]), we strongly disapprove of the substitution of unsworn police reports and summaries for affidavits *or testimony* of the percipient witnesses. *A hearing in open court* would have been particularly appropriate to ascertain the relevant facts in this matter, because both Seymour [the juror involved] and Case [police officer knowledgeable about the trial evidence] were initially evasive about the scope and content of their conversation. (But cf. *Linhart* v. *Nelson* (1976) 18 Cal.3d 641 [134 Cal.Rptr. 813, 557 P.2d 104] [stating rule in civil cases].)" (Italics added.)

The *People* v. *Pierce* court did not point out the reason for an apparently different rule in civil and criminal cases. As I analyze the problem, the reason no doubt seemed too obvious to require elucidation. It is necessary only to refer to Penal Code section 1181,⁶ which provides both the manner of procedure and grounds for a motion for new trial in criminal cases. Differing from Code of Civil Procedure section 658, which requires that when the motion is made on the ground of jury misconduct "it must be made upon affidavits," Penal Code section 1181 contains no such limiting provision. In fact, only subdivision 8, which deals with the ground of newly discovered evidence, requires that the motion be initiated with supporting affidavits. Certainly, where restraints and penalties, as in this case of great magnitude, are involved, there is good reason for the variance between civil procedures and criminal procedures.

---

"2Defendants inaccurately contend *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 793-794 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717], holds that a litigant may call witnesses in support of motion for new trial. The *Bardessono* court merely noted the *Saltzman* holding, neither applying it nor relying upon it in the opinion."

⁶Penal Code section 1181 provides as follows: "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new

In the instant case, defendant's counsel had not limited himself to the affidavits of his investigators, but had served each juror with a subpoena and several were present in court at the time of the new trial motion. Defendant's counsel requested that the jurors be permitted to testify. In *People* v. *Merrill* (1951) 104 Cal.App.2d 257, 268 [231 P.2d 573], the court said: "The fact that the alleged witnesses refused to give defendant's attorneys affidavits is no reason for considering their conclusions as to what their testimony might be. Defendant could have subpoenaed them to the hearing of the motion for new trial." As noted, counsel for

trial, in the following cases only:

"1. When the trial has been had in his absence except in cases where the trial may lawfully proceed in his absence;

"2. When the jury has received any evidence out of court, other than that resulting from a view of the premises, or of personal property;

"3. When the jury has separated without leave of the court after retiring to deliberate upon their verdict, or been guilty of any misconduct by which a fair and due consideration of the case has been prevented;

"4. When the verdict has been decided by lot, or by any means other than a fair expression of opinion on the part of all the jurors;

"5. When the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial, and when the district attorney or other counsel prosecuting the case has been guilty of prejudicial misconduct during the trial thereof before a jury;

"6. When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed;

"7. When the verdict or finding is contrary to law or evidence, but in any case wherein authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed;

"8. When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as, under all circumstances of the case, may seem reasonable.

"9. When the right to a phonographic report has not been waived, and when it is not possible to have a phonographic report of the trial transcribed by a stenographic reporter as provided by law or by rule because of the death or disability of a reporter who participated as a stenographic reporter at the trial or because of the loss or destruction, in whole or in substantial part, of the notes of such reporter, the trial court or a judge, thereof, or the reviewing court shall have power to set aside and vacate the judgment, order or decree from which an appeal has been taken or is to be taken and to order a new trial of the action or proceeding."

defendant in the instant case did exactly what was suggested in *Merrill.*[7]

Since in criminal cases testimony to establish juror misconduct is admissible, and since, from the record, it cannot be held that evidence established the juror misconduct as alleged, the judgment and the order denying the motion for a new trial should be vacated with directions to again hear and determine the motion for a new trial in accordance with the rules hereinabove stated. "If the trial court determines that a new trial should be granted, defendant will be entitled to a trial on the merits, but if it is determined that the new trial should be denied, then the trial court shall again pronounce judgment upon defendant. (See Pen. Code, §§ 1168, 1191, 1193, 1200, 1202, 1207 and 1213.) The time limits provided for in the sections just cited shall run from the filing of the remittitur in the superior court." (*People* v. *Robarge* (1953) 41 Cal.2d 628, 635 [262 P.2d 14].)[8]

A petition for a rehearing was denied March 23, 1982, and appellant's petition for a hearing by the Supreme Court was denied June 9, 1982.

---

[7]The majority fail to observe the applicability of *Merrill* (see their fn. 3). Its relevance should be obvious for it approves, *in a criminal case*, the calling of witnesses and the taking of testimony to establish a ground for new trial which, under civil procedure, could be established only by affidavit. (Code Civ. Proc., § 658 limits proof of newly discovered evidence to affidavits and newly discovered evidence as a ground for new trial is set forth in Code Civ. Proc., § 657, subd. 4 just as jury misconduct (Code Civ. Proc., § 657, subd. 2 is limited. *Linhart* v. *Nelson, supra,* 18 Cal.3d 641.)) *Merrill* approves the subpoenaing of the witness, upon refusal to give an affidavit, even though Penal Code section 1181, subd. 8 states "the defendant must produce at the hearing, in support thereof, the affidavits ..." Likewise, if the majority are suggesting that witnesses other than jurors *may* be called to *testify*, I do not understand the rationale. In many instances such misconduct could only be established through the mouths of the jurors themselves. I see no benefit to the administration of justice or advantage to the jury process by the sacrifice of proper jury conduct.

[8]Defendant contends that his counsel, in failing to obtain proper affidavits from those jurors who were willing to discuss the presence of the newspaper articles (Sommer, Andjur and Whitsit) was ineffective under *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]. The rationale of this argument is compelling if the juror's testimony was properly refused.