Filed 4/26/22  P. v. Arellano CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090025 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE007408) |
| v. | |
| JOSE ISREAL ARELLANO, | |
| Defendant and Appellant. | |

After a jury found defendant Jose Israel Arellano guilty of willful infliction of corporal injury for pushing his ex-girlfriend, A.A., down a stairwell in their house, a potential witness claimed A.A. had fabricated her testimony and attempted to suborn him. Defendant moved for a new trial based on this newly discovered evidence and contends the trial court, in denying the motion, erred by finding the evidence merely cumulative and not credible.  Agreeing the evidence is not credible, we affirm.

1

BACKGROUND

Due to the limited nature of the claim on appeal, we need not fully recite the facts of the underlying trial. It suffices to say A.A. testified that, after their relationship deteriorated and defendant became abusive, they decided to sell the house they co-owned. As she was moving out, defendant pushed her down a flight of stairs, causing minor injuries. Her testimony was corroborated by her friend and business partner, Lupe, who witnessed the offense firsthand and called 911. Theorizing A.A. fabricated the offense in retaliation for litigation between her and defendant and because she wanted to keep the house, defendant sought to impeach both witnesses based on their putatively inconsistent statements, relationship, communication about the case, and involvement in the litigation. Defendant also sought to establish an alibi: by the time Lupe called 911, he had strolled into a nearby Walmart. The prosecution argued he could have pushed A.A. down, fled to Walmart, and then returned in the established timeframe, and additionally presented evidence showing defendant had a propensity for abusive and harassing behavior.

Three days after the jury entered the verdict finding defendant guilty of willful infliction of corporal injury, a man named Raphael called the district attorney's crime lab and began leveling dark but shifting allegations against A.A. According to a criminalist who spoke with him, Raphael claimed everything A.A. alleged against defendant was untrue, she had similarly made false allegations in a prior relationship, and she promised Raphael carnal rewards if he killed defendant. Raphael was leery about providing his contact information, indicating he was concerned A.A. would find out.

Four days later, an investigator from the district attorney's office, Dale Joe, followed up with Raphael to get more background. Raphael reported he did not know defendant; he met A.A. earlier that year in a store where she began flirting with him. A.A. allegedly told him she would " 'do just about anything to keep the house' " and Raphael could " 'be with her' " if he helped her. But his account of A.A.'s proposition changed: Instead of wanting defendant killed, Raphael now claimed A.A. told him she

2

was going to accuse defendant of trying to kill her, and she wanted Raphael to testify defendant had mistreated her. Raphael refused, feeling it was not right. Raphael also stated that, about a week before investigator Joe contacted him, A.A. bragged to Raphael about the ill-gotten verdict and that she was assured of getting the house or the bulk of its proceeds. Raphael requested anonymity.

Raphael's story changed again six weeks later when Kimberly Clark, another investigator from the district attorney's office, called him. This time, Raphael claimed to be unaware of the verdict. He also claimed to have a text message from A.A., which he would have shared with the investigator had he known how to take a screenshot. He stated he was willing to call A.A. and to have his phone records subpoenaed but then backtracked, claiming that without a guarantee of anonymity he would not assist further.

Two weeks later, investigator Clark contacted A.A., who initially denied knowing Raphael. Eventually, A.A. acknowledged she knew a "Rafa," whom she had met in the last year and visited twice. He was listed in her phone not by name but by reference to their mutual acquaintance, Martha, who, according to one of A.A.'s adult sons from another relationship, had known defendant for 13 to 15 years, had dated some of Martha's relatives, and had worked at the same company as her. Raphael reputedly was a psychic who, from a glance at a photograph, could divine a person's suitability as a romantic partner and foretell the fate of relationships. At Martha's recommendation, A.A. had sought Raphael's clairvoyance about her then-current boyfriend. But A.A. maintained that, although she briefly discussed defendant with Raphael, she neither told him about the house and abuse nor asked him to testify on her behalf. She had one text message from Raphael, which had his address.

A.A. agreed on the spot to place a pretext call to Raphael, then in Mexico, to confront him about his conversations with the district attorney's office. He acknowledged he had performed a relationship "analysis" for her and did not dissent when she recounted her version of the events, including that she knew Raphael through

3

Martha, had only met with him twice, and that those meetings were not about defendant, much less some nefarious scheme. Raphael repeatedly denied speaking with the district attorney's office, claiming he had "no idea" what any of this was about and "no motive" to talk to them. They were, he intimated, "corrupt" and "make things up."

Two months later, when an investigator for the public defender's office contacted him, Raphael refused further involvement. A.A. knew where he lived, he stated, and he did not want anything to do with her; it was up to the district attorney's office to decide what to do next.

Stating "[t]he whole thing frankly is very odd," the trial court denied defendant's new trial motion, concluding that Raphael's testimony was unlikely to yield a different result on retrial. The court reasoned that Raphael's testimony would have constituted cumulative impeachment evidence, stating: "[A.A.'s] motive to gain possession of the house, to fabricate charges against the defendant, and to retaliate against possible [litigation] against her is clearly elicited by defense counsel. Adding yet another alleged incident to bolster her ulterior motives would not have changed the outcome of the verdict." Additionally, Raphael's testimony would not have affected the prosecution's propensity evidence or defendant's non-definitive alibi. The court also concluded "based on the pretext call and other information" that Raphael lacked credibility, stating: "The witness was extremely evasive in the pretext call—he appears to be uncooperative—and the fact that [A.A.] agreed to participate in the pretext call with [Raphael]. If she had something to hide, then she would not agree to the pretext call, fearing that [Raphael] might disclose the conversation he allegedly had."

DISCUSSION

Defendant contends the trial court, in denying his new trial motion, erred by finding Raphael's statements were cumulative impeachment evidence and not credible. We may affirm the court's ruling on any basis apparent from the record. (*People v. Dawkins* (2014) 230 Cal.App.4th 991, 1004; see *People v. McGaughran* (1961)

4

197 Cal.App.2d 6, 17 [denial of new trial motion based on lack of credibility alone].) Here, agreeing with the court's credibility finding, we need not address whether the evidence would be merely cumulative.

" ' "To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial." [Citation.] "[T]he trial court has broad discretion in ruling on a new trial motion . . . ," and its "ruling will be disturbed only for clear abuse of that discretion." [Citation.] In addition, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." [Citation.]' [Citation.]" (*People v. O'Malley* (2016) 62 Cal.4th 944, 1016; Pen. Code, § 1181, subd. (8).)

Preliminarily, "[w]hen a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given . . . ." (Pen. Code, § 1181, subd. (8).) Here, defendant produced affidavits describing Raphael's statements by the criminalist, investigator Joe, and the defense investigator Raphael refused to cooperate with. Their hearsay testimony would, at most, provide an incomplete secondhand account of Raphael's inconsistent statements, themselves a retelling of out-of-court statements allegedly made by A.A. Because defendant failed to present an affidavit from Raphael—the witness by whom the newly discovered evidence was expected to be given—his motion was procedurally deficient, and the trial court could have properly denied the motion on this basis. (See *People v. Beeler* (1995) 9 Cal.4th 953, 1005 [affidavit alleging insufficient evidence supports denial of new trial]; *People v. Miramontes* (1957) 153 Cal.App.2d 402, 403-404 [upholding denial of new trial motion that was based on hearsay]; *People v. Merrill* (1951) 104 Cal.App.2d 257, 268 [affidavits based on inadmissible hearsay could not be considered]; *People v. Fice* (1893) 97 Cal. 459, 460 [no affidavit by the proper witness].)

Even assuming the admissibility of Raphael's statements, substantial evidence supports the trial court's finding that they were unworthy of credence. Credibility determinations generally involve relevant factors such as the consistency of a witness's statements, consistency of the statements with other evidence, and the bias or motives of the witness. (See *People v. O'Malley, supra*, 62 Cal.4th at p. 1017; *People v. Howard* (2010) 51 Cal.4th 15, 43; *People v. Delgado* (1993) 5 Cal.4th 312, 329.) A credibility determination may be based on expressed or implied findings. (See *People v. Cua* (2011) 191 Cal.App.4th 582, 609 [" 'trial court's factual findings, express or implied, made on a motion for new trial will be upheld if supported by substantial evidence' "].)[1]

Here Raphael claimed A.A. wanted to conspire with him to murder defendant. But then he stated she wanted him to help frame defendant for a crime, asserting without substantiation she had made similar false allegations in a prior relationship. Raphael also whipsawed about the verdict, claiming A.A. bragged about it before reversing himself and professing ignorance. And in the pretext call, Raphael not only denied communicating with the district attorney's office, he elided the topic of A.A.'s alleged machinations and did not resist her contrary version of the events, which the trial court found more credible based on her willingness to participate in the call. More broadly, Raphael purported to be concerned about a criminal plot against defendant, yet he did not bother reporting this for over half a year, mere days after the verdict. All along, he conditioned his cooperation on anonymity despite being the sole witness who could restore justice. But once exposed, with ostensibly nothing further to lose, Raphael refused to cooperate, leaving a supposedly innocent man's life upended. Finally, the trial court reasonably could have inferred that Raphael was connected to defendant through

---

[1] Thus, although the trial court focused its express finding primarily on defendant's behavior in the pretext call, our review is not, as defendant suggests, limited to that portion of the record.

Martha, who introduced Raphael to A.A. and had a longstanding relationship with defendant, further diminishing Raphael's credibility. (See *People v. Delgado, supra*, 5 Cal.4th 312, 329.) Raphael's conflicting allegations, tacit confirmation of A.A.'s story, and questionable motives thus undermined the credibility of his statements, rendering unlikely a different result on retrial. Therefore, because substantial evidence supports the trial court's credibility determination, we conclude the court did not abuse its discretion in denying the motion for a new trial.

DISPOSITION

The judgment is affirmed.


_____\s\_____,
BLEASE, P. J.


We concur:


\_\_\_\_\_\s\_____,
HULL, J.


\_\_\_\_\_\s\_____,
HOCH, J.

7